Filed 1/5/24  In re J.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>N.L.,<br><br>    Defendant and Appellant. | E081724<br><br>(Super.Ct.Nos. J292817, J292818, J292820 & J292821)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court terminated defendant and appellant N.F.'s (mother), parental rights as to S.M. (minor, born September 2013), A.C. (born April 2017), S.L. (born September 2019), J.C. (born January 2021), and B.L. (born April 2022, collectively "the children"). On appeal, mother contends the court erred in declining to apply the beneficial parental relationship exception to termination of her parental rights as to S.M.[1] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 7, 2022, personnel from plaintiff and respondent, San Bernardino County Children and Family Services (the department), received an immediate response referral when mother tested positive for amphetamines, and admitted to using methamphetamine and marijuana, after giving birth to B.L., who also tested positive for amphetamines. Mother said she had relapsed.

Mother reported having four other children in her custody who were staying with her sister. She said she and the children had been living in motels since her house burned down. Mother said her brother and sister-in-law would procure her a motel room after she was discharged from the hospital.

---

[1] Mother appeals from the orders denying her section 388 petitions and terminating her parental rights as to all the children; however, mother only argues that the court abused its discretion in terminating her parental rights as to minor.

[2] By order dated July 27, 2023, this court incorporated the record in case No. E080813, from mother's notice of intent to file a petition for extraordinary writ, in the record in this case.

The social worker obtained a protective custody warrant for the children. When she arrived at the home, she was approached by M.D., the father of three of the children listed on the warrant.[3] The social worker detained the children at the maternal grandmother's home.

Minor stated they had been living with the maternal grandmother off and on. Mother would sometimes stay there. Mother had six prior department referrals and an extensive criminal history, including several convictions for possession of and being under the influence of controlled substances. Mother had an outstanding warrant for failure to participate in drug court.

The department filed Welfare and Institutions Code[4] section 300 juvenile dependency petitions alleging, as to mother, that she had a substance abuse problem (b.1) and that she lived an unsafe and unstable lifestyle (b.2).[5] On April 13, 2022, the court detained the children.

In the jurisdiction and disposition report filed on April 29, 2022, the social worker requested a continuance to complete ICWA inquiries. Minor's father was located in an

---

[3] Only S.L., who was named in the protective custody warrant, was the subject of the instant proceedings. The two other children of M.D., named in the protective warrant who were not subjects of the instant proceedings, lived in North Dakota with M.D.'s adult daughter, who had obtained a legal guardianship over them when M.D. went to prison. None of the fathers are parties to the appeal.

[4] All subsequent statutory references are to the Welfare and Institutions Code.

[5] The first amended petitions filed July 18, 2022, did not change the allegations against mother.

in-patient drug program. He said that mother "was on drugs all the time." On May 4, 2022, the court continued the matter.

In the first addendum report filed June 16, 2022, the social worker recommended the court sustain the allegations and grant mother reunification services. Mother reported that minor's father was incarcerated when minor was born, that mother never received support from him, and that he continued to be in and out of incarceration. Mother stated she had been using methamphetamine since she was 27 or 28. She had recently relapsed. She had entered three substance abuse programs but had never completed one. Mother failed to show to two random drug tests.

In an additional information for the court filed on July 13, 2022, the social worker reported that mother was arrested on June 28, 2022. The criminal court had revoked mother's probation; the hearing on her revocation was set for July 27, 2022. Mother had not participated in any services; she failed to show to three additional random drug tests.

At a hearing on July 19, 2022, mother's counsel indicated mother remained in custody. The court continued the matter because mother and one of the fathers had not been transported to court.

On August 12, 2022, mother's counsel requested supervised visits while she remained in custody. Mother indicated she would be released in May 2023. The court found the allegations in the petitions true, removed the children, and granted parents reunification services.

Mother wrote the court a letter dated September 13, 2022, which reflected that she was still incarcerated. Mother requested to be reunified with the children. Another letter dated January 10, 2023, also reflected mother remained incarcerated.

In a status review report filed February 14, 2023, the social worker recommended mother's reunification services be terminated. Mother remained incarcerated with a release date of May 1, 2023. Mother had phone visits with the children every Monday; she would speak with minor for between 15 to 20 minutes. Minor would stay on the phone longer than the other children. The social worker noted that due to the age of the children and the timeframe for reunification, mother would not have enough time to complete services once released.

At the contested hearing on February 28, 2023, counsel for the children asked the court to follow the social worker's recommendation: "I hope that when Mom is released she continues to get better and stabilize her situation. But at this point I don't think it would be enough for the children to be returned . . . ." Counsel for the department noted, "I understand at this time that Mother is incarcerated. However, when the case began Mother was not in custody. Mother, on her own actions, was arrested and charged with certain things which allowed her to be incarcerated."

The court found that "even assuming the best case scenario that Mom is out on May 1st, this case came in for drugs and unstable lifestyle. And those issues, in order to be remedied for return, would require a sustained period of sobriety, out-patient testing, and I don't think that a month of that would demonstrate that she is in a position to have

5

her children returned to her. So I don't believe that there would be a substantial probability of return with only the possibility of a month out of custody." The court terminated mother's reunification services and set the section 366.26 hearing.

Mother filed a notice of intent to file a petition for extraordinary writ. On March 27, 2023, this court dismissed the case after mother's counsel filed a letter reflecting there were no legal or factual bases upon which to file a petition.

In the section 366.26 report filed June 15, 2023, the social worker requested a 60-day continuance to complete an adoption assessment. Minor "reported that she did not want to be adopted and hoped to go home with her mother." The caregivers, with whom A.C. had also been placed, explained adoption, legal guardianship, and long term foster care to minor. She was undecided. A.C. wanted to be adopted by the caregivers. Minor was to explore her feelings on the matter with her therapist. The caregivers were "not open to lower plans of permanency, such as legal guardianship or long term foster care."

Mother engaged in visitation once weekly by telephone while incarcerated. "Since her release, the mother has started in[-]person visits with the children on the [second] Monday of each month." "There has only been one visit with mother within this reporting period."

On July 5, 2023, mother filed section 388 petitions requesting the court grant her an additional six months of services. Mother alleged the requested services were in the children's best interest because she had consistently visited with them "monthly as allowed by the current orders." The "children are bonded to me and would benefit from

6

continuing the positive beneficial relationship they have with me so that we can reunify as a family." On July 6 and 7, 2023, the court denied the petitions, finding mother failed to state new evidence or a change in circumstances, and the proposed change was not in the children's best interests.

Mother testified at the contested section 366.26 hearing as to J.C. and B.L. on July 6, 2023. She visited the children telephonically while incarcerated from June 2022 to May 2023. Mother had one, in-person visit in June 2023. The court found mother had not met any of the three prongs for application of the beneficial parental relationship exception to termination of parental rights. Thus, it terminated mother's parental rights to J.C. and B.L.

In the addendum report filed August 17, 2023, the social worker recommended the court terminate mother's parental rights to A.C. and minor. The social worker noted A.C. and minor had been in the prospective adoptive placement since October 2022: "The children are bonded to the caregivers and to the caregiver's young son." Minor had been quiet and reserved on the issue of adoption. "She has stated that she is happy in the home and has no worries. When asked about adoption, she expresses sadness about not being able to see her mother or return home to mother." S.M. was receiving therapy to address those feelings. She was coming to terms with adoption. Although her first choice would have been to go home to mother, "she would be okay with staying in the [prospective adoptive home] with her brother and being adopted."

"The caregivers desire to adopt the children and want the best for them. They would like to maintain sibling relationships, however, want to wait until the adoption is in progress."

The prospective adoptive parents "consider the children to be part of their family." They were not open to maintaining a relationship between the children and the biological parents. However, they were willing to maintain sibling contact.

In an addendum report dated August 22, 2023, the social worker reported mother visited with minor on July 24, and August 16, 2023. The visits were reported to have gone well.

At the hearing on August 24, 2023, mother's counsel argued that minor did not agree with adoption and expressed sadness about not being able to return to mother: "I think that, based on that evidence, we would ask the Court to find it's in the minor's best interest to order a plan of legal guardianship rather than adoption." Minor's counsel requested the court follow the department's recommendations: "Both minors are doing well where they're at and they've been placed for almost a year now; they're well bonded with the caretakers." Counsel for the department noted that although they initially continued the matter because minor did not want to be adopted, she now said she would be okay being adopted in the home with her brother.

The court found that "the parents have begun visiting, so at least recently they meet the first prong . . . ." The court also found "that the child has a substantial positive emotional attachment, I believe that [minor] does have that." However, the court found

"as to prong three, that terminating that attachment would be detrimental when balanced against the benefits of the new adoptive home, I don't believe the parents have met their burden on that prong, . . ."

With respect to minor, the court noted, "she is nine years old. While she is bonded to the mother, overall in her best interest, permanency is what she needs most. While she may suffer some consequences from the termination of parental rights, I believe, based on the stability that she has had over the last year, remaining with her sibling in the adoptive home is what is in her best interest." Thus, the court terminated mother's parental rights to minor and A.C.

## II. DISCUSSION

Mother contends the court erred in declining to apply the beneficial parental relationship exception to the termination of her parental rights as to minor. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated

9

reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .' " (*Id.* at p. 635.)

Here, as both parties agree, the court found mother had met both the first and second prongs of the beneficial parental relationship exception, that mother had maintained regular visitation with minor and had an emotional bond with her. Thus, because the department does not challenge the court's findings on the first two prongs, we address only the third, detriment.

*Detriment*

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

11

Here, mother had longstanding struggles with drug addiction, which interfered with her custody of S.M. Mother had an extensive criminal history due to her drug addiction, which included stints of up to 16 months in jail. Indeed, mother was on probation at the inception of the case, had her probation revoked, and remained incarcerated during most of the proceedings below.

Minor stated they had been living with the maternal grandmother off and on. Mother would only sometimes stay with them. Mother initially reported the children were staying with her sister. Mother declined to testify at the section 366.26 hearing as to minor. Thus, the record reflects that minor had an unstable life in which she was in and out of mother's actual, physical custody depending on mother's incarcerations due to her long-standing drug dependency.

On the other hand, minor was bonded to the prospective adoptive parents and their child. She was "happy in the home and has no worries." Minor was coming to terms with adoption. Although her first choice would have been to go home to mother, "she would be okay with staying in the [prospective adoptive home] with her brother and being adopted."

Although the juvenile court is required to consider a child's wishes, the "child's wishes are not necessarily determinative of whether termination of parental rights will be in the child's best interest. [Citations.]" (*In re I.E.* (2023) 91 Cal.App.5th 683, 694.) Here, where minor's statements about adoption were equivocal, the court's determination

12

that an adoptive placement with her brother was in her best interest was well within the court's discretion.

The prospective adoptive parents wanted to adopt and provide for minor. They wanted to maintain her relationships with her other siblings who were not in their custody.

The prospective adoptive parents "consider the children to be part of their family." They were willing to maintain sibling contact. Minor's counsel requested the court follow the department's recommendations: "Both minors are doing well where they're at and they've been placed almost a year now; they're well bonded with the caretakers."

The court reasoned that although minor was "bonded to the mother, overall in her best interest, permanency is what she needs most. [Although], she may suffer some consequences from the termination of parental rights, I believe, based on the stability that she has had over the last year, remaining with her sibling in the adoptive home is what is in her best interest."

Mother failed to make a compelling showing that the loss of minor's relationship with her would harm minor to an extent not outweighed, on balance, by the security of a new, adoptive home with the prospective adoptive parents and her brother. Thus, the court acted within its discretion in determining the circumstances were not exceptional, such that the termination of mother's parental rights would not be detrimental to minor.

### III. DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

MENETREZ
J.